FILED

FEB 0 9 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N D I C T M E N T |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 23 CR 0079 |
| | ) | Title 18, United States Code, |
| PAUL KIMMINS LEBO, | ) | Section 1343 |
| | ) | |
| Defendant. | ) | JUDGE FLEMING |

## GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

1.     Defendant PAUL KIMMINS LEBO resided in the Northern District of Ohio, Eastern Division.

2.     Paul Kimmins Investments, LP ("PKI") was a hedge fund formed in Delaware on or about February 22, 2018, and registered in Ohio on or about March 9, 2018.

3.     PK Investments GP, LLC ("PKI-GP") was a limited liability company formed in Delaware on or about February 22, 2018, and registered in Ohio on or about March 9, 2018. PKI-GP was the general partner of PKI.

4.     Defendant was the managing member of PKI-GP with 51% ownership.

5.     Defendant acted as an investment advisor in that he received compensation for providing investment advice to individuals.

6.     Defendant maintained and operated bank accounts at Banks 1 through 7.  Banks 1 through 7 were federally insured financial institutions.

7. Defendant maintained and operated brokerage accounts at Brokerages 1 through 5.

8. Website 1 was the classified advertisement section of a social media website. Website 1 specialized in helping individuals and businesses buy and sell items locally.

9. Website 2 was a professional social networking website.

10. Individuals who invested in PKI and/or PKI-GP, who provided Defendant with short-term loans, and/or who paid Defendant for items that Defendant purported to sell via Website 1 (collectively, "the Victims") resided in jurisdictions throughout the United States, including in the Northern District of Ohio.

11. Victim 1 was an individual who resided in Pennsylvania.

12. Victims 2 through 16 were individuals who resided throughout the United States, including in the Northern District of Ohio.

<u>COUNT 1</u>
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury charges:

13. The allegations contained in paragraphs 1 through 12 of this Indictment are incorporated by reference as if stated fully herein.

<u>The Scheme to Defraud</u>

14. From in or around August 2017 to in or around October 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant PAUL KIMMINS LEBO, with the intent to defraud, did knowingly devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, by inducing Victims to invest in future ownership of PKI and

converting their money to his own use; by inducing Victims to invest in options trading with PKI and converting their money to his own use; by soliciting short-term loans from Victims knowing he did not and would not have the means to repay the loans and converting the money to his own use; and by listing on Website 1 and agreeing to sell items to Victims while intending to convert their payments to his own use without ever delivering the items.

Manner and Means

15.     The manner and means by which Defendant carried out the scheme included, but were not limited to, the following:

A.     <u>PKI equity ownership fraud</u>

16.     Defendant solicited and accepted deposits from the Victims for future equity ownership of PKI, falsely promising that the Victims would receive the equity ownership at the time the hedge fund was launched.

17.     Defendant induced the Victims to invest in PKI by advising them that their deposits were refundable upon request if the individual later decided not to join PKI. Defendant advised the Victims that their investments in PKI would be used for investing in the stock market or held in an escrow account. Defendant advised the Victims that they would be entitled to a percentage of the annual performance fee of PKI. Defendant claimed he would pay the performance fee personally.

18.     Defendant used the Victims' PKI deposits for personal expenses, including payments to family members, payments for health insurance for both Defendant and Defendant's parents, and payments for utilities and phone service for both Defendant and Defendant's parents.

B.      PKI options trading fraud

19.     Defendant solicited investments from the Victims for "options trading strategies" with PKI. Defendant told the Victims the options trading strategy was an investment opportunity separate from the ownership investment in PKI.

20.     Defendant induced the Victims to invest by falsely advising there would be downside protection on their investment, telling Victims that 80% of the Victims' investment capital was protected and that the risk of loss to the investor was therefore capped at 20%. Downside protection would involve using investment strategies to mitigate or prevent a decrease in the value of an investment, but Defendant did not employ an investment strategy with any downside protection, exposing investors to the risk of 100% losses of their investment capital.

21.     Defendant induced the Victims to invest by falsely stating that Defendant had personally invested his money in the options trading strategy.

22.     Defendant used the Victims' investments in PKI options trading for personal expenses, including payments to Defendant's family members, payments for health insurance for Defendant's parents, payments for utilities for both Defendant and Defendant's parents, payments for rent for the residence of both the Defendant and the Defendant's parents, and payments for costs related to Defendant's unsuccessful attempts to acquire real estate.

C.      Concealment of the PKI schemes to defraud

23.     Defendant furthered and concealed the scheme by forming legal entities as purported investment funds when those entities were shell corporations with no legitimate operations and no assets, and when Defendant and PKI were insolvent.

24.     If a Victim asked Defendant to withdraw some or all of the Victim's investment, Defendant made fraudulent representations about the status of the Victim's investment to delay

4

and lull the Victim into a false sense of security, and to provide excuses for delays in returning the Victim's investment.

25.  From time to time, Defendant, without permission or authorization, used new investor funds or his parents' funds to repay prior Victims.

26.  From time to time, purporting to return Victims some of their investments, Defendant provided checks drawn on Defendant's bank accounts, which did not have sufficient funds for the checks.

D.  Short-term loans

27.  Defendant solicited loans from Victims by providing false explanations for why Defendant needed the loans and false assurances about Defendant's ability to repay the loans.

28.  Contrary to his representations to Victims who loaned him money, Defendant used most of the loan funds to make trades on the stock market, which resulted in the loss of the loan proceeds, and also used some of the loan funds to repay Victims who previously loaned money to Defendant and to pay Victims who Defendant had fraudulently induced to provide money for investments or for purchases through Website 1.

29.  Defendant provided Victims false excuses as to why Defendant was unable to repay loans at the original agreed deadline.  Defendant made false promises to repay loans in order to delay and lull the Victims into a false sense of security while concealing how Defendant had lost and spent the loan proceeds.

E.  Website 1 "sales"

30.  Defendant used Website 1 to offer items for sale without ever intending to deliver the items.  Defendant accepted payment for the "sales" from multiple Victims for the same item. He then used the money Victims paid for the items to trade on the stock market and to repay

earlier Victims who had provided Defendant money for the PKI equity ownership and/or PKI options trading.

F.     Losses

31.     From on or about August 13, 2017, to on or about July 21, 2021, Defendant induced approximately 99 Victims to provide Defendant a total of approximately $800,124.86 for future equity ownership of PKI, for Defendant's PKI options investment strategy, and/or for short-term loans to Defendant.

32.     Without authorization, Defendant utilized his parents' funds to repay individuals who invested money with the Defendant and loaned money to the Defendant, resulting in losses to Defendant's parents of approximately $49,630.00.

33.     From on or about April 10, 2021, to June 28, 2021, Defendant accepted approximately $18,565 from seven Victims for the purported "sale" of items on Website 1 that Defendant never delivered.

Acts in Furtherance of the Scheme

34.     The acts caused by Defendant in furtherance of the scheme, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

*Use of Victim 1's investment to pay real estate settlement*

35.     On or about November 16, 2017, during the time Defendant was soliciting deposits from the Victims for ownership in PKI, Defendant entered into a real estate purchase agreement for a home in San Francisco, CA, with a contract price of $2,000,000.  The purchase agreement called for Defendant to purchase the home with cash, but Defendant had insufficient assets to complete the purchase and defaulted on the contract.

6

36.  On or about December 8, 2017, Defendant entered into a settlement to pay the seller $40,000 for defaulting on the contract.

37.  On or about December 12, 2017, Defendant sent an email to Victim 1 with the subject "Paper Portfolio," which memorialized an agreement between Defendant and Victim 1 for which Victim 1 agreed to invest $50,000 with Defendant in what was described as a "paper portfolio." Defendant advised Victim 1 the $50,000 could be withdrawn in January 2018 if Victim 1 desired to do so.

38.  On or about December 13, 2017, Defendant caused Victim 1 to send Defendant $50,000 from Victim 1's bank account to Defendant's Bank 1 account by way of bank wire transfer, which Defendant used to pay the $40,000 settlement for the default on his real estate contract.

*Misrepresentations about PKI to Victims*

39.  In or around February 2018, Defendant formed and registered both PKI and PKI-GP in Delaware and Ohio, respectively, even though Defendant and PKI were financially insolvent by no later than November 16, 2017, because of Defendant's stock market trading losses and depletion of PKI funds for personal expenses.

40.  From on or about January 6, 2018, to on or about January 8, 2021, Defendant falsely advised the Victims via text message and instant messages through Website 2's messaging feature that their investments had increased in value when, in fact, Defendant's misuse of the Victims' investments in PKI, including his stock market trading losses, had resulted in the loss of nearly 100% of the Victims' investments.

41.     On or about June 30, 2020, Defendant falsely advised multiple Victims by way of text messages that PKI had launched and would have $3 million in assets under management by the end of the July.  PKI never had assets under management and remained insolvent.

42.     On or about August 27, 2020, Defendant sent an email to Victim 1 that included an attachment purporting to be a document from Defendant's brokerage company showing the balance of Defendant's brokerage account.  In fact, Defendant had created the attachment himself using the brokerage company's logo and information.  The falsified document made it appear that Defendant's account had a balance that far exceeded the account's actual value.

*Use of Victim 15's investment to pay personal expenses*

43.     On or about April 13, 2020, Defendant contacted Victim 15 by way of Website 2's messaging feature.  Defendant advised that Victim 15's prior investment with Defendant had doubled in value in order to induce Victim 15 to make an additional investment, causing Victim 15 to wire $2,000 to Defendant for additional investment in an option-trading strategy.  In fact, as Defendant then knew, as of April 13, 2020, Victim 15's investment with Defendant was worth $0.

44.     On or about April 14, 2020, Defendant used $1,000 of Victim 15's funds to make a payment to Defendant's credit card, which Defendant used for personal expenses.

*Use of Victim 16's investment to repay prior investors*

45.     On or about April 20, 2020, Defendant caused Victim 16 to send Defendant $10,000 by way of a bank wire transfer, which Defendant confirmed had been received and would be invested in an option trade strategy in the shares of a particular publicly traded company, and that the investment had downside protection of 80%.

8

46.     Instead, on or about April 20, 2020, Defendant utilized Victim 16's funds to repay prior PKI investors.

*Fraudulent representations used to secure short-term loans*

47.     From on or about July 23, 2020, through on or about September 30, 2020, Defendant told Victims 2 and 3 that he needed a short-term loan because he was closing on a real estate sale that was pushed back a week due to the COVID-19 pandemic. In fact, no such real estate sale existed.

48.     On or about July 30, 2020, Defendant advised Victim 2 that he needed a loan for personal rent and falsely advised he had a real estate transaction expected to close which would allow Defendant to repay the loan. In fact, no such pending real estate transaction existed.

49.     From on or about September 24, 2020, through on or about September 28, 2020, Defendant falsely advised Victim 3, who previously invested in Defendant's PKI ownership equity and PKI options trading schemes, that Defendant would have funds available to repay Victim 3, but that Defendant needed a short-term loan first.

50.     On or about October 29, 2020, Defendant falsely advised Victim 9, who had previously invested with Defendant in the PKI equity ownership and/or PKI options trading schemes described above, that Defendant was selling real estate and had an urgent need for cash. Defendant falsely stated that he could repay the loan by the end of the following week.

51.     On or about November 8, 2020, Defendant advised Victims 4 through 8 that Defendant needed a short-term loan to complete the launch of PKI and could repay the money in two weeks. In fact, PKI had been insolvent for approximately three years at that time.

52.     From on or about December 31, 2020, through on or about January 9, 2021, Defendant falsely advised Victims 1, 4 through 8, and 10 through 14 that he was selling PKI and

9

needed a loan for closing expenses. Defendant induced those Victims to loan him money by advising he would share some of the profits from the sale.

53.     On or about January 1, 2021, Defendant contacted Victim 13 using Website 2's messaging feature and advised Victim 13 that Defendant was selling his business. Defendant said he had closing expenses and asked Victim 13 for a loan, saying he would share some profit with Victim 13 and return Victim 13's original investment of approximately $3,500 in Defendant's option trade strategy.

54.     On or about January 5, 2021, Defendant caused Victim 13 to send Defendant $1,000, using a mobile phone application for person-to-person payments, as a loan, based on Defendant's representation that he had to pay closing costs associated with the sale of his business.

55.     On or about January 5, 2021, Defendant used Victim 13's funds to repay a prior investor $299.

56.     On or about January 6, 2021, Defendant used Victim 13's funds to send a bank wire transfer of $500 to Defendant's personal brokerage account. Defendant used those funds to purchase stock option contracts which expired, worthless, on January 8, 2021.

*Website 1 "sales"*

57.     In or around April 2021, Defendant listed an antique stove and other items for sale on Website 1. Defendant accepted payment for the sale of the same purported antique stove from seven different Victims. Defendant never delivered the stove to any Victims, and instead used the money he received from them to trade on the stock market and to repay Victims who provided Defendant money for the PKI equity ownership and PKI options trading schemes.

10

Execution of the Scheme

58.    On or about August 27, 2020, in the Northern District of Ohio, Eastern Division,

Defendant PAUL KIMMINS LEBO, for the purpose of executing and attempting to execute the

above-described scheme and artifice to defraud and deprive, transmitted and caused to be

transmitted writings, signs, signals, pictures, and sounds by means of wire and radio

communication in interstate commerce, to wit: an email sent by Defendant, in Ohio, to Victim 1,

in Pennsylvania, through servers located outside of Ohio, that included a falsified document

purporting to be a document from Defendant's brokerage company showing the balance of

Defendant's brokerage account, and making it appear that Defendant's account had a balance

that far exceeded the account's actual value, in violation of Title 18, United States Code, Section

1343.


                                                        A TRUE BILL.